M. Gregory Weisz, Wyo. Bar No. 6-2934
PENCE AND MACMILLAN LLC
1720 Carey Ave., Ste. 600
Cheyenne, Wyoming 82001
Tel.: (307) 638-0386
gweisz@penceandmac.com
Plaintiff's Attorney

Matthew L. Schwartz (*pro hac vice* forthcoming)
Sara K. Winik (*pro hac vice* forthcoming)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Tel: (212) 446-2300
mlschwartz@bsfllp.com
swinik@bsfllp.com
Plaintiff's Attorneys

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2020 MAY 19  AM 10: 02

MARGARET BOTKINS, CLERK
CHEYENNE

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| ERIK PRINCE, | : | |
| | : | |
| Plaintiff, | : | CASE NO. |
| | : | 20-CV-84-J |
| v. | : | |
| | : | |
| THE INTERCEPT, a New York company, | : | **COMPLAINT** |
| FIRST LOOK MEDIA WORKS, INC., a | : | |
| Delaware corporation, MATTHEW COLE, an | : | **JURY TRIAL DEMANDED** |
| individual, and ALEX EMMONS, an | : | |
| individual, | : | |
| | : | |
| Defendants. | : | |
| | : | |

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

PARTIES .......................................................................................................................... 4

JURISDICTION AND VENUE .......................................................................................... 5

FACTUAL ALLEGATIONS .............................................................................................. 6

    I.      MR. PRINCE'S BUSINESS ............................................................................. 6

    II.     THE INTERCEPT'S BUSINESS .................................................................... 7

    III.    THE INTERCEPT'S HISTORY OF BIAS AGAINST MR. PRINCE ............................ 8

    IV.   APRIL 13, 2020: THE INTERCEPT PUBLISHES ITS DEFAMATORY STORY ......... 9

    V.    AS INTENDED, THE APRIL 13 STORY WAS REPUBLISHED, CITED, OR
          SHARED THROUGHOUT THE WORLD ................................................. 15

    VI.   APRIL 14, 2020: THE INTERCEPT FAILED TO CORRECT OR RETRACT ITS
          DEFAMATORY STORY .............................................................................. 18

    VII.  MR. PRINCE HAS SUFFERED HARM AS A RESULT OF DEFENDANTS'
          ACTIONS ...................................................................................................... 19

FIRST CAUSE OF ACTION ............................................................................................ 20

SECOND CAUSE OF ACTION ....................................................................................... 23

REQUEST FOR RELIEF ................................................................................................ 26

JURY DEMAND ............................................................................................................. 26

## COMPLAINT

Erik Prince brings this action against The Intercept, First Look Media Works, Inc., Matthew Cole, and Alex Emmons (collectively, the "Defendants"). Mr. Prince's allegations are made upon personal knowledge as to himself and his own conduct, and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.      This action arises out of a corporate scheme by The Intercept, First Look Media Works, Inc., Matthew Cole, and Alex Emmons, as well as others, to discredit Erik Prince by publishing false or misleading statements about him and his business in The Intercept, in order to boost The Intercept's readership, gain notoriety, and profit at Mr. Prince's expense.

2.      Although The Intercept's crusade against Mr. Prince has been several years in the making, it recently stepped up its misinformation campaign by publishing a story about Mr. Prince that was not only entirely fictional, but which also accuses Mr. Prince of being a criminal and a traitor.

3.      Despite not having a single source who would go on record, The Intercept published a story on April 13, 2020 titled *"Erik Prince Offered Lethal Services To Sanctioned Russian Mercenary Firm Wagner"* (the "Story").[1] The Story was co-authored by Matthew Cole and Alex Emmons, and included input and oversight by the entire editorial board of The Intercept, including its editor-in-chief, Betsy Reed.

4.      The central premise of the Defendants' Story is the false claim that Mr. Prince "met earlier this year with a top official of Russia's Wagner Group and offered his mercenary

---

[1]      https://theintercept.com/2020/04/13/erik-prince-russia-mercenary-wagner-libya-mozambique/

1

forces to support the firm's operations in Libya and Mozambique." The Story goes on to accuse Mr. Prince of engaging in "illegal" conduct because the alleged solicitations violated the sanctions imposed on the Wagner Group by the Office of Foreign Assets Control ("OFAC") of the U.S. Treasury. In a far cry from journalism, the Story claims the alleged actions taken by Mr. Prince—a former U.S. Navy SEAL Officer and patriot who faithfully served his country for eight years—"threaten democracy."

5. As the Defendants well know, Mr. Prince never once met with any official from the Wagner Group. Mr. Prince never offered his services to support the Wagner Group's operations in Libya and Mozambique. Mr. Prince never sent the Wagner Group a proposal to offer his services in Libya and Mozambique. Nor did Mr. Prince ever cause any third party to meet with or submit a proposal to the Wagner Group on his behalf. The statements to the contrary in The Intercept's April 13, 2020 Story are demonstrably false and defamatory. The statements intended to harm and did harm Mr. Prince's personal and business reputation and relationships.

6. The Defendants acted with actual malice in publishing the defamatory statements because, prior to publication, they knew that the allegations claiming that Mr. Prince met with the Wagner Group and solicited the Wagner Group for business were false. At a minimum, the Defendants entertained serious doubts about the truth of the defamatory statements. This is because counsel for Mr. Prince specifically told the Defendants that the statements were false before they published the article. In addition, the Defendants did not have one single source that would go on record to verify the information. Nevertheless, the Defendants chose to go ahead and publish the false and unsubstantiated statements anyway. When presented with the opportunity to retract the Story and correct the narrative, the Defendants declined to do so,

2

choosing instead to continue trafficking in lies to discredit Mr. Prince under the guise of journalism.

7. The Defendants' Story barely attempts to conceal their bias against Mr. Prince. The April 13th Story essentially accuses Mr. Prince of being a traitor to his country, offering to operate in the "shadows" as an agent of the Russian military, in circumstances where the Russian government itself "seeks plausible deniability." This skewed reporting compounds The Intercept's extensive negative coverage of Mr. Prince spanning several years. With headlines like: "*Notorious Mercenary Erik Prince is Advising Trump From The Shadows*," "*Inside Erik Prince's Treacherous Drive to Build a Private Air Force*," "*Erik Prince, Perjury, and the Secret Trump Tower Meeting*," "*Did Blackwater's Erik Prince Lie to Congress About a Trump Tower Meeting? I Asked Him*," "*Before He Was FBI Director, Chris Wray Supervised An Investigation That Found Erik Prince Likely Broke U.S. Law*," "*The Persistent Influence of Trump's 'Shadow Advisor' Erik Prince*," "*The Complete Mercenary: How Erik Prince Used The Rise of Trump to Make an Improbable Comeback*", and "*The FBI Is Investigating Erik Prince For Trying To Weaponize Crop Dusters*," the Intercept has made its bias against Mr. Prince clear.[2]

8. Moreover, the Defendants' newsgathering methods were designed to confirm a false narrative, not gather accurate facts. Instead of conducting a basic factual inquiry common among all responsible news organizations, the Defendants sourced their reporting from

---

[2] https://theintercept.com/2017/01/17/notorious-mercenary-erik-prince-is-advising-trump-from-the-shadows/; https://theintercept.com/2016/04/11/blackwater-founder-erik-prince-drive-to-build-private-air-force/; https://theintercept.com/2019/03/14/erik-prince-perjury-and-the-secret-trump-tower-meeting/; https://theintercept.com/2019/03/08/erik-prince-trump-mehdi-hasan/; https://theintercept.com/2018/03/19/erik-prince-frontier-services-group-chris-wray-fbi/; https://theintercept.com/2019/11/05/erik-prince-trump-ukraine-china/; https://theintercept.com/2019/05/03/erik-prince-trump-uae-project-veritas/; and https://theintercept.com/2020/02/20/erik-prince-fbi-investigation-trump-barr/.

3

unsubstantiated claims by anonymous sources—if those anonymous sources actually even exist. This process was deeply flawed and represents an obvious and intentional disregard for the truth.

9.     As the Defendants intended, their Story containing several false or misleading statements about Mr. Prince garnered significant attention and has been republished and cited by other news outlets worldwide. By design, the Defendants also generated significant traffic for the Story. The Story was shared and discussed widely on Twitter, Facebook, and Reddit, among other places.

10.     Largely due to the inflammatory and demonstrably false statements in the April 13th Story, The Intercept's notoriety has increased at the expense of the truth and Mr. Prince's personal and professional reputation. Not surprising, therefore, The Intercept has indicated that it intends to publish additional stories about Mr. Prince's alleged business activities.

## PARTIES

11.     Plaintiff Erik Prince ("Mr. Prince") is a citizen and resident of Park County, Wyoming, where he has resided since 1993. Mr. Prince is a decorated veteran, having served for five years as an active duty U.S. Navy SEAL officer, and for three more years in the Navy reserves. Following his active duty military service, Mr. Prince founded and ran Blackwater, the U.S. government contractor that worked alongside and supported the Armed Services and other U.S. government agencies. Mr. Prince is the founder and Chairman of the private equity firm Frontier Resource Group, as well as an executive Director and Vice Chairman of Frontier Services Group, a leading provider of integrated security, logistics, insurance and infrastructure services for clients operating in frontier markets. Mr. Prince conducts the majority of his business from Wyoming.

12.     Defendant The Intercept is a New York company with its principal place of business in New York, New York. It is an online news publication owned by First Look Media

4

Works, Inc. The Intercept is best known for publishing classified national security intelligence leaked by Edward Snowden in violation of federal law.

13.     Defendant First Look Media Works, Inc. ("First Look Media") is a media company organized and existing as a corporation under the laws of the State of Delaware, with its principal place of business in New York, New York. It is owned by the billionaire Pierre Omidyar who founded eBay. At all times First Look Media has owned and operated the URL and website www.theintercept.com.

14.     Defendant Matthew Cole is a reporter for The Intercept who co-authored the April 13, 2020 Story that included several false or misleading statements about Mr. Prince, as well as numerous of The Intercept's prior stories about Mr. Prince cited in paragraph 7, above.[3] Cole is a resident of the State of New York.

15.     Defendant Alex Emmons is a reporter for The Intercept who co-authored the April 13, 2020 Story that included several false or misleading statements about Mr. Prince. Emmons is a resident of the District of Columbia.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds the jurisdictional sum of $75,000.

---

[3]     https://theintercept.com/2016/04/11/blackwater-founder-erik-prince-drive-to-build-private-air-force/; https://theintercept.com/2018/03/19/erik-prince-frontier-services-group-chris-wray-fbi/; https://theintercept.com/2019/11/05/erik-prince-trump-ukraine-china/; https://theintercept.com/2019/05/03/erik-prince-trump-uae-project-veritas/; and https://theintercept.com/2020/02/20/erik-prince-fbi-investigation-trump-barr/

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Plaintiff's claims occurred within this judicial district.

18.     This Court has personal jurisdiction over each of the Defendants because there are jurisdictionally-sufficient minimum contacts between the Defendants and Wyoming, and the exercise of personal jurisdiction over the Defendants in Wyoming will not offend traditional notions of fair play and substantial justice. The Defendants could reasonably anticipate that a suit based upon their acts and omissions with respect to Mr. Prince and Wyoming could result in them being subject to suit in this State, and this suit arose directly out of the Defendants' acts or omissions in relation thereto. All factual allegations of this Complaint with respect to the Defendants are incorporated into this paragraph by reference.

## FACTUAL ALLEGATIONS

### I.     MR. PRINCE'S BUSINESS

19.     Mr. Prince is an American businessman.

20.     After graduating college, Mr. Prince attended the U.S. Officer Candidate School and was commissioned as an officer in the U.S. Navy. He went on to become a Navy SEAL officer and a member of SEAL Team 8, one of the most elite groups within the U.S. military. After Mr. Prince's term of service in the Navy concluded following five years of active duty, Mr. Prince remained on reserve duty for an additional three years.

21.     After his term of active duty service in the Navy concluded, in or about 1997, Mr. Prince founded Blackwater. Under Mr. Prince's leadership, Blackwater won numerous U.S. government contracts, such as providing support for government agencies in the aftermath of the bombing of the U.S.S. Cole in Yemen, assisting in the hunt for Osama Bin Laden following the September 11, 2001 attacks, providing support and training in Iraq and Afghanistan, and

protecting domestic government facilities following Hurricane Katrina. Mr. Prince sold his interest in Blackwater to outside investors in 2010.

22. Since then, Mr. Prince has founded and served as the chairman of private equity firm Frontier Resources Group, which invests in various companies in the natural resources, logistics, and transport spaces. Mr. Prince was also appointed an executive Director and Vice Chairman of Frontier Services Group, a leading provider of integrated security, logistics, insurance, and infrastructure services for clients operating in frontier markets. Mr. Prince conducts the majority of his work for Frontier Resources Group and Frontier Services Group from Wyoming.

## II. THE INTERCEPT'S BUSINESS

23. The Intercept is an online news publication founded in February 2014 by First Look Media.

24. It has been reported that The Intercept built its reputation by hiring journalists who had obtained classified National Security Agency ("NSA") documents leaked by Edward Snowden in violation of federal law, and then publishing stories based on those classified documents.

25. The billionaire and eBay founder, Pierre Omidyar, provided the funding to launch The Intercept and continues to support it through his company First Look Media. According to public reports, between 2013 and 2017, Omidyar gifted $87 million worth of eBay and PayPal stock to First Look Media. He has pledged a total of $250 million to fund First Look Media's journalistic efforts.

26. In addition to funding The Intercept, Omidyar made a $100,000 donation to the Super PAC "NeverTrump PAC" during the 2016 presidential election. Confirming his donation, Omidyar tweeted that he thought "Trumpism is dangerous." In other tweets, Omidyar stated that

7

"Trump is a dangerous authoritarian demagogue," a "bigot," a "thin-skinned" "scaredy-cat" with "no spine," and has publicly compared President Trump to Adolf Hitler on Twitter.

27.     As reported by other news outlets, Omidyar has touted his "soft power influence" by giving hundreds of thousands of dollars to Democratic Party candidates since 1999, donating millions to the Clinton Global Initiative, and using his "philanthropic network" to promote various regime changes around the world.

28.     Despite Omidyar's sizable donation to fund First Look Media and The Intercept, it has been publicly reported by various sources, including the Columbia Journalism Review, that The Intercept has been forced to make significant budget cuts in the past few years, including laying off its entire research team. On the heels of these budget cuts, The Intercept made repeated appeals to readers for donations. The Columbia Journalism Review posited that the appeal for reader contributions—as opposed to relying solely on Omidyar's donation—was due to the need to maintain The Intercept's status as a "public charity" in order to preserve its tax-exempt status and enable Omidyar to avoid capital gains taxes while deducting his stock transfer as a charitable donation.

## III.     THE INTERCEPT'S HISTORY OF BIAS AGAINST MR. PRINCE

29.     Since its inception, The Intercept has had a history of biased reporting against Mr. Prince due to his political views and public support of President Trump.

30.     In one of its earliest attack pieces on Mr. Prince, an October 22, 2014 story titled *"Blackwater Founder Remains Free and Rich While His Former Employees Go Down on Murder Charges,"* the Intercept—a purported news organization—described Mr. Prince as a "secretive right-wing Christian supremacist" who has "deep ties to the Bush Administration and

served as a sort of neoconservative Praetorian Guard for a borderless war launched in the immediate aftermath of 9/11."[4]

31.     The Intercept's skewed reporting did not let up.  Between 2014 and the present, The Intercept published over a dozen stories about Mr. Prince attacking his character, political views, and business record.  With headlines like *"Notorious Mercenary Erik Prince is Advising Trump From The Shadows," "Inside Erik Prince's Treacherous Drive to Build a Private Air Force," "Erik Prince, Perjury, and the Secret Trump Tower Meeting," "Did Blackwater's Erik Prince Lie to Congress About a Trump Tower Meeting? I Asked Him," "Before He Was FBI Director, Chris Wray Supervised An Investigation That Found Erik Prince Likely Broke U.S. Law," "The Persistent Influence of Trump's 'Shadow Advisor' Erik Prince," "The Complete Mercenary: How Erik Prince Used The Rise of Trump to Make an Improbable Comeback,"* and *"The FBI Is Investigating Erik Prince For Trying To Weaponize Crop Dusters,"* The Intercept's clear bias against Mr. Prince was revealed.

32.     Far from reporting on objective facts, these stories revealed The Intercept's clear prejudice and actual malice against Mr. Prince.  For example, in its March 9, 2019 story titled *"Did Blackwater's Erik Prince Lie to Congress About a Trump Tower Meeting? I Asked Him,"* The Intercept wrote that Mr. Prince had "ties to the scandal-plagued Trump campaign," called Mr. Prince "racist," and claimed he had a "Trumpian relationship with the truth."[5]

## IV.     APRIL 13, 2020: THE INTERCEPT PUBLISHES ITS DEFAMATORY STORY

33.     On April 13, 2020, the Defendants published the Story, titled *"Erik Prince Offered Lethal Services To Sanctioned Russian Mercenary Firm Wagner."*  The headline was

---

4       https://theintercept.com/2014/10/22/blackwater-guilty-verdicts/
5       https://theintercept.com/2019/03/08/erik-prince-trump-mehdi-hasan/

accompanied by an image of Mr. Prince's head in profile, mug-shot style, superimposed over the

Russian flag:





## ERIK PRINCE OFFERED LETHAL SERVICES TO SANCTIONED RUSSIAN MERCENARY FIRM WAGNER



Matthew Cole, Alex Emmons
April 13 2020, 11:15 a.m.

34. The Story was listed prominently on The Intercept's homepage under the heading

"Top Stories,"[6] and was in fact for a period of time the only story amongst The Intercept's "Top

Stories" that did not concern the COVID-19 pandemic. A full month after the Story was

published, as of at least May 12, 2020, the Story (and the image depicted above) remained

highlighted on The Intercept's homepage under the heading "National Security."

35. The Story included false or misleading statements of fact as a critical part of the

Defendants' continued campaign to discredit Mr. Prince.

36. The false statements consisted primarily of assertions that Mr. Prince met earlier

this year with a top official of Russia's Wagner Group, which the Story described as "a semi-

---

[6]     https://theintercept.com/2020/04/13/erik-prince-russia-mercenary-wagner-libya-
mozambique/

private military force that operates in countries or conflicts where the Russian government seeks plausible deniability for its activities," but which is "often equipped and supported directly by the Russian Ministry of Defense." The Story stated that Mr. Prince "offered his mercenary forces to support the firm's [*i.e.*, Wagner Group's] operations in Libya and Mozambique."

37.     The false statements in the Story also included the allegation that, at some unspecified time "[a]fter Wagner lost more than a dozen fighters in Mozambique, Prince sent a proposal to the Russian firm offering to supply a ground force as well as an aviation-based surveillance."

38.     The Defendants' statements were reasonably understood by third parties to mean that Mr. Prince and his businesses engage in unlawful activities including violating sanctions imposed on Wagner Group by OFAC, sanctions imposed in Libya by both the United States and the United Nations, and U.S. arms trafficking regulations.

39.     Specifically, the Defendants falsely claimed that Mr. Prince:

  a.   "sought in recent months to provide military services to a sanctioned Russian mercenary firm in at least two African conflicts;"

  b.   "met earlier this year with a top official of Russia's Wagner Group;"

  c.   "met with Wagner leadership;"

  d.   "offered his mercenary forces to support the [Wagner Group's] operations in Libya and Mozambique;"

  e.   sought to assist the Russian military by providing "a force in Mozambique;" and

  f.   "sent a proposal to the Russian firm offering to supply a ground force as well as aviation-based surveillance."

40.     These statements were made with knowledge of their falsity, with reckless disregard of their truth or falsity, or with negligence. The Defendants knew that the statements were false before they published the Story because, among other reasons, the Plaintiff told the Defendants that their reporting was false, the Defendants deliberately avoided the truth by refusing to engage with Plaintiff, and Defendants did not have a single source that would go on record to verify the information. The Defendants failed to conduct the most basic factual inquiries common among any responsible news organization. Instead, the Defendants uncritically repeated and adopted as true unsubstantiated claims of anonymous sources—if such sources even actually exist. In doing so, the Defendants willfully misrepresented facts that they knew or should have known to be false or misleading.

41.     The Defendants' first and only attempt to contact Mr. Prince prior to publication of the Story came in a comment call e-mail on the afternoon of Friday, April 10, 2020. The e-mail, from Defendant Matthew Cole to Mr. Prince's counsel, indicated that The Intercept intended to publish a story "early next week" including the allegation that Mr. Prince met with a Wagner Group senior official earlier in 2020, and that he had caused a third party to submit a proposal to Wagner on his behalf.

42.     Counsel responded to Cole that his allegations were false, and specifically that Mr. Prince had never met, or even considered meeting, representatives of Wagner. Counsel also requested any additional details about the supposed meeting—such as when or where it supposedly took place—so that he could demonstrate to Cole that no such meeting ever happened.

43.     Cole did not respond. Instead, on the morning of Monday, April 13, 2020, The Intercept posted the Story, including the false and misleading allegations that Mr. Prince had met with and solicited business from a senior Wagner Group representative, and that he had caused a written proposal to be delivered to Wagner Group.

44.     Mr. Prince did not meet with any representative of Wagner Group earlier this year, never offered his services to support Wagner Group's operations in Libya and Mozambique, and never sent Wagner Group a proposal to offer his services in those countries. In fact, Mr. Prince has never met with a representative of Wagner Group. Nor has Mr. Prince caused any third party to meet with or submit a proposal to Wagner Group on his behalf.

45.     Nonetheless, the Defendants published the Story knowing that it contained false allegations, and without any follow-up with Mr. Prince or his counsel, in order to advance their own false narratives about Mr. Prince. The Story's allegation that Mr. Prince met with representatives of Wagner was sourced entirely to anonymous sources, and the Story did not identify any details of the purported meeting, such as when or where it supposedly took place, or who was supposedly there.

46.     The false statements in the Story were reasonably understood by third parties to mean that Mr. Prince, who has served his country faithfully as a U.S. Navy SEAL officer, engaged in traitorous activities against the interests of the U.S.

47.     Among other things, the Story leveled the following allegations of treason against Mr. Prince without any basis for doing so:

     a. The alleged proposed relationship between Mr. Prince and Wagner would "in effect, make the influential Trump administration adviser a subcontractor to the Russian military."

     b. The Story accused Mr. Prince of seeking to aid the Libyan National Army and its leader, the "strongman Khalifa Hifter," whereas the United States and United Nations "recognize the Government of National Accord in the Libyan capital

Tripoli as the country's official leaders. . . . Americans are prohibited from aiding either side of the conflict without U.S. government authorization."

    c. The Story alleged that Mr. Prince has "ties to" China and the United Arab Emirates, continuing that "[t]he conflicts between Prince's commercial interests and the goals of the many governments that retain his services have piled up."

48.    In addition, the Story quoted an array of purported subject matter experts in order to bolster the Story's false claim that Mr. Prince is somehow acting adversely to U.S. interests, behaving "egregious[ly]," and engaging in conduct that "is a dangerous thing for any democracy." Those quotations include the following:

    a. "Wagner Group is an instrument of Russian policy. It works under the GRU, which is the Russian military intelligence"

    b. "In my experience, the act of soliciting from a sanctioned party would indeed be an apparent violation" of U.S. law according to one supposed expert, "adding that pitching business to Wagner 'would seem to be a fairly egregious thing to do.'"

    c. "The reason why groups like Wagner exist, and the reason why people like Erik Prince [are] succeeding, is that modern war is getting sneakier and mercenaries and groups like Wagner are a great way to get things done in the shadows."

    d. "The conflicts of interest are deep and threaten democracy when you have a free agent going between the U.S. and its main power rivals. . . . It would never clear an intelligence community background check. This is a dangerous thing for any democracy."

49.    The Defendants' defamatory statements were made as part of a long scheme by the Defendants to knowingly publish false, misleading, and defamatory statements about Mr.

Prince in order to inflict malicious harm upon Plaintiff, further the Defendants' political agenda, boost The Intercept's readership, and reap the associated financial gains, including the continued viability of the publication.

50.     Knowing that Mr. Prince lived in Wyoming and conducted the majority of his business from Wyoming, the Defendants aimed their defamatory actions at Wyoming, intending to cause harm in the state.  Indeed, the focal point of the Defendants' Story involved the false allegation that Mr. Prince, from his principal place of business in Wyoming, "offered lethal services" to the Wagner Group.

51.     The Defendants' knowledge that Mr. Prince lived in and conducted the majority of his business in Wyoming is demonstrated by, among other things, prior reporting by Defendant Matthew Cole, published in The Intercept, which referenced Mr. Prince's Wyoming home and included at least two purported photographs of that property, including alleged business activities occurring there.[7]

52.     The Defendants succeeded in directing harm within Wyoming because, as a direct result of the Story, Mr. Prince's reputation and professional opportunities within Wyoming suffered.

53.     The Defendants have indicated that their campaign against Mr. Prince will continue.

## V.     AS INTENDED, THE APRIL 13 STORY WAS REPUBLISHED, CITED, OR SHARED THROUGHOUT THE WORLD

54.     As the Defendants intended, news outlets throughout the world republished or cited The Intercept's April 13 Story.

---

[7]     https://theintercept.com/2019/05/03/erik-prince-trump-uae-project-veritas/.

55.     On April 13, 2020, the *Daily Beast* published an article titled *"Erik Prince Offered*

*Military Services to Sanctioned Russian Mercenary Firm: Report."*[8]  The article cited The

Intercept's Story published earlier that day, reporting that: "Erik Prince, founder of the private

security company Blackwater and a Trump administration adviser, has recently attempted to

cultivate a business relationship with a sanctioned Russian paramilitary organization called the

Wagner Group, The Intercept reported on Monday."

56.     The same day, *The Intellectualist* published an article titled *"Report: Erik Prince*

*Offered His Services To Sanctioned Mercenary Backed By Putin."*[9]  The article parroted The

Intercept's false reporting, writing that: "The Intercept reported Monday that Prince, who is the

brother of Education Secretary Betsy DeVos, met with one of Wagner's top officials to offer his

mercenary forces in two current conflicts in Africa — those in Libya and Mozambique."

57.     The following day, *The Moscow Times* published an article titled *"Trump-Linked*

*Contractor Offered Military Services to Russia's Wagner in Africa-Intercept."*[10]  Again, the

article cited The Intercept Story and claimed that Mr. Prince "offered military services to

Russia's Wagner mercenary group in Libya and Mozambique earlier this year, Investigative

website The Intercept reported Monday."

58.     On April 19, 2020, *SOFREP*, a leading digital media company focused on

military news, published an article titled *"Wagner Group: Russian Mercenaries Still Floundering*

---

[8]     https://www.thedailybeast.com/erik-prince-offered-military-services-to-sanctioned-russian-mercenary-firm-wagner-report-says

[9]     https://mavenroundtable.io/theintellectualist/news/report-erik-prince-offered-his-services-to-sanctioned-mercenary-backed-by-putin-Gm88rtU71k-nJZBMNqMa9A

[10]     https://www.themoscowtimes.com/2020/04/14/trump-linked-contractor-offered-military-services-to-russias-wagner-intercept-a69986

*In Africa*."[11] Citing The Intercept's Story, *SOFREP* wrote that, "Prince reportedly met earlier this year with a Wagner Group official and offered to bolster Wagner's operations in Libya and Mozambique."

59.     Other outlets have picked up and/or republished the Story, as well.[12]

60.     In addition to the Story being picked up by other news outlets, the Story garnered significant traffic on social media.

61.     On April 13, 2020, The Intercept's Twitter account tweeted or re-tweeted a link to the Story five separate times in a single day. Defendants Matthew Cole and Alex Emmons also tweeted links to the Story. Many influential media personalities, including CNN's Jake Tapper, MSNBC's Malcolm Nance, Politico's Natasha Bertrand, the Daily Beast's Noah Shachtman, and the New York Times's Adam Goldman, shared the Story on Twitter, as well. Combined, these tweets have generated almost five-thousand "re-tweets," Twitter "shares," and "likes," all of which further spread the false and defamatory narrative about Mr. Prince. For example, whereas The Intercept's Twitter account is followed by approximately 800,000 users, Jake Tapper alone is followed by approximately 2.4 million people—all of whom would have been notified about the Story.

---

[11]     https://sofrep.com/news/wagner-group-russian-mercenaries-still-foundering-in-africa/

[12]     *See e.g.*, https://www.democraticunderground.com/113326906; https://inforussie.com/2020/04/14/trump-linked-contractor-offered-military-services-to-russias-wagner-in-africa-intercept/; https://eutoday.net/news/security-defence/2020/new-entry; https://progressivepartyusa.com/progressive-news/erik-prince-offered-lethal-services-to-sanctioned-russian-mercenary-firm-wagner/; and https://warontherocks.com/2020/05/pulling-troops-out-of-africa-could-mean-another-endless-war/.

62.     In addition, as of May 7, 2020, the Story had generated over nine thousand messages on Reddit discussion boards. On Facebook, the Story has been the subject of more than 16,100 engagements (comments, "likes," or shares).

63.     In response to the Story, Mr. Prince's Wikipedia page was also updated. The page now includes an entire section under the heading "Proposed cooperation with Wagner group," which states: "In April 2020, *the Intercept* reported that Prince has offered his services as a subcontractor to russan [*sic*] Wagner group's activities in Mozambique and Libya, suggesting to provide aerial surveillance platforms and a ground force." The Wikipedia page also links directly to the Story.[13]

64.     The broad dissemination of the Story across many media and social media platforms has further harmed Mr. Prince's personal and professional reputation.

## VI.     APRIL 14, 2020: THE INTERCEPT FAILED TO CORRECT OR RETRACT ITS DEFAMATORY STORY

65.     On April 14, 2020, counsel for Mr. Prince sent the Defendants a letter reiterating that their reporting on Mr. Prince in the April 13 Story was false and defamatory. Counsel noted that Mr. Prince never met with any representative of Wagner Group, never offered Wagner Group or any other Russian individual mercenary services, and certainly never submitted or caused to be submitted on his behalf a proposal to Wagner Group.

66.     In addition to noting that the factual underpinnings for The Intercept's Story were categorically false, counsel highlighted the deeply flawed "newsgathering" process. Specifically, counsel noted that The Intercept failed to conduct the most basic factual inquiries common

---

[13]     https://en.wikipedia.org/wiki/Erik_Prince

among all responsible news organizations, and instead uncritically repeated the false and unsubstantiated claims of anonymous sources.

67. Counsel for Mr. Prince gave the Defendants an opportunity to take down and retract the Story.

68. Later that day, in-house counsel for First Look Media responded that The Intercept stood by the Story. The Defendants declined to retract, correct, or take down the April 13 Story about Mr. Prince. Instead, the Defendants' lawyer warned that the April 13 Story was just "one in a series of planned articles concerning Mr. Prince's activities."

69. On April 17, 2020, counsel for Mr. Prince once again sent the Defendants a letter reiterating that their reporting on Mr. Prince in the April 13 Story was false and defamatory and gave the Defendants another opportunity to take down and retract the Story. Noting that the Defendants provided "no information about when or where this supposed meeting between Mr. Prince and a representative of Wagner took place, who the Wagner representative was, or other details that would enable Mr. Prince to respond," counsel for Mr. Prince offered the Defendants the opportunity to provide the information so Mr. Prince could more fully respond to the allegations.

70. In response, the Defendants declined to provide additional information about their allegations or take down and retract the Story. As of May 18, 2020, the Story has not been corrected in any way.

## VII. MR. PRINCE HAS SUFFERED HARM AS A RESULT OF DEFENDANTS' ACTIONS

71. By spreading false and misleading information about Mr. Prince, and by accusing him of being a criminal and a traitor, the Defendants have placed Mr. Prince in a false light

19

before the world-at-large and have caused Mr. Prince serious damage to his personal and professional reputation.

72.     By falsely claiming that Mr. Prince engaged in illegal conduct and violated U.S. and U.N. sanctions and U.S. arms trafficking regulations by allegedly soliciting business from Wagner Group, the Defendants have portrayed Mr. Prince—a decorated veteran—as a criminal and a traitor.

73.     These allegations have caused Mr. Prince to suffer substantial harm and special damages under the law including, without limitation, monetary loss; harm to Mr. Prince's reputation and good will; resulting loss of profits; interference with and damage to Mr. Prince's relationships with contractual partners, bankers, lenders, and the media; loss of market share, business opportunities, and access to markets and investors worldwide; loss of recruiting opportunities; loss of investment capital; loss of operating capital; impairment of his ability to raise capital through equity and debt markets; and impairment of his ability to continue to grow his clientele.

74.     The Defendants' threat that the April 13 Story was just the beginning of a series of attacks on Mr. Prince's personal and professional relationship means that he likely will suffer continuing harm.

## FIRST CAUSE OF ACTION

### Defamation Per Se
### (Against All Defendants)

75.     The Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

76.     The Defendants made false and defamatory statements as alleged herein about Mr. Prince and published these statements in writing to unprivileged third parties including, but not

limited to, persons viewing the Defendants' websites and persons viewing websites republishing the Defendants' defamatory statements.

77.     The Defendants made false and defamatory statements concerning Mr. Prince in the April 13, 2020 Story titled *"Erik Prince Offered Lethal Services To Sanctioned Russian Mercenary Firm Wagner"* which was published on www.theintercept.com and included the following false statements of fact:

      a.   That Mr. Prince "sought in recent months to provide military services to a sanctioned Russian mercenary firm in at least two African conflicts;"

      b.   That Mr. Prince "met earlier this year with a top official of Russia's Wagner Group;"

      c.   That Mr. Prince "met with Wagner leadership;"

      d.   That Mr. Prince "offered his mercenary forces to support the [Wagner Group's] operations in Libya and Mozambique;"

      e.   That Mr. Prince sought to assist the Russian military by providing "a force in Mozambique;"

      f.   That "[a]fter Wagner lost more than a dozen fighters in Mozambique, Prince sent a proposal to the Russian firm offering to supply a ground force as well as aviation-based surveillance."

78.     The Defendants' statements were defamatory, tending to expose Mr. Prince to public hatred, contempt, ridicule and disgrace. The Defendants' statements also tend to discredit Mr. Prince in the conduct of his business. In particular, the Defendants' statements were reasonably understood by third parties to mean that Mr. Prince and his business engage in unlawful activities including violating sanctions imposed on Wagner Group by OFAC, sanctions

imposed in Libya by the U.S., U.N., and other authorities, and U.S. arms trafficking regulations. The statements also were reasonably understood by third parties to mean that Mr. Prince, who has served his country faithfully as a U.S. Navy SEAL officer, engaged in traitorous activity.

79.     In truth, Mr. Prince did not meet with any representative of Wagner Group earlier this year, never offered his services to support Wagner Group's operations in Libya and Mozambique, and never sent Wagner Group a proposal to offer his services in those countries. In fact, Mr. Prince has never met with a representative of Wagner Group. Nor has Mr. Prince caused any third party to meet with or submit a proposal to Wagner Group on his behalf.

80.     The Defendants knew it was foreseeable that that the defamatory statements would be repeated by second parties. The Defendants, as the originators, are liable for each repetition of the defamatory matter by second parties.

81.     The Defendants made the defamatory statements with knowledge of their falsity, with reckless disregard of their truth or falsity, or with negligence.

82.     The Defendants made the defamatory statements with the intent and import that the statements were assertions of facts and not merely opinion.

83.     The Defendants knew such statements disparaged Mr. Prince and his business, and intended these statements to cause Mr. Prince pecuniary loss.

84.     The Defendant's defamatory statements were made as part of a long scheme by the Defendants to publish false, misleading, and defamatory statements about Mr. Prince in order to discredit Mr. Prince, further the Defendants' political agenda, boost The Intercept's readership, and reap the associated financial gains, including the continued viability of the publication.

85.     The statements had a natural and probable defamatory effect on the reader without the necessity of explanatory matter and accordingly, the Defendants' defamatory statements are

defamatory per se. Among other things, the defamatory statements impugn Mr. Prince's business reputation and accuse him of illegal and traitorous conduct.

86.     The Defendants' defamatory statements were a substantial factor in causing harm to Mr. Prince, including without limitation, monetary loss; harm to Mr. Prince's reputation and good will; resulting loss of profits; interference with and damage to Mr. Prince's relationships with contractual partners, bankers, lenders and the media; loss of market share and business opportunity for his services; loss of recruiting opportunities; loss of investment capital; loss of operating capital; impairment of his ability to raise capital through equity and debt markets; and impairment of his ability to continue to grow his clientele.

87.     Mr. Prince is entitled to injunctive relief restraining the Defendants from committing further defamation per se.

88.     The Defendants made their defamatory statements with fraud, oppression, actual malice, malicious intent, and with intent to cause the foregoing and other harm to Mr. Prince and his business. Accordingly, Mr. Prince is entitled to, and should be awarded, punitive damages against each of the Defendants.

## SECOND CAUSE OF ACTION

### Defamation Per Quod
### (Against All Defendants)

89.     The Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

90.     The Defendants made false and defamatory statements as alleged herein about Mr. Prince and published these statements in writing to unprivileged third parties including, but not limited to, persons viewing the Defendants' websites and persons viewing websites republishing the Defendants' defamatory statements.

23

91.     To the extent any of the defamatory statements identified above and incorporated herein by reference are not defamatory per se, they are defamatory per quod. Because of facts and circumstances known to the readers of the statements, the statements tended to injure Mr. Prince's business.

92.     The Defendants' statements were defamatory, tending to expose Mr. Prince to public hatred, contempt, ridicule and disgrace. The Defendants' statements also tend to discredit Mr. Prince in the conduct of his business. In particular, the Defendants' statements were reasonably understood by third parties to mean that Mr. Prince and his business engage in unlawful activities including violating sanctions imposed on Wagner Group by OFAC, sanctions imposed in Libya by the U.S., U.N., and other authorities, and U.S. arms trafficking regulations. The statements also were reasonably understood by third parties to mean that Mr. Prince, who has served his country faithfully as a U.S. Navy SEAL officer, engaged in traitorous activity.

93.     The Defendants made false and defamatory statements concerning Mr. Prince in the April 13, 2020 Story titled "*Erik Prince Offered Lethal Services To Sanctioned Russian Mercenary Firm Wagner*," which was published on www.theintercept.com. Copies of related materials were made available to unprivileged third parties including, but not limited to, persons viewing the Defendants' websites and persons viewing websites republishing the Defendants' defamatory statements.

94.     The Defendants knew it was foreseeable that that the defamatory statements would be repeated by second parties. The Defendants, as the originators, are liable for each repetition of the defamatory matter by second parties.

95.     The Defendants made the defamatory statements with knowledge of their falsity, with reckless disregard of their truth or falsity, or with negligence.

96.     The Defendants made the defamatory statements with the intent and import that the statements were assertions of facts and not merely opinion.

97.     The Defendants knew such statements disparaged Mr. Prince and his business, and intended these statements to cause Mr. Prince pecuniary loss.

98.     The Defendant's defamatory statements were made as part of a long scheme by Defendants to publish false, misleading, and defamatory statements about Mr. Prince in order to discredit Mr. Prince, further the Defendants' political agenda, boost The Intercept's readership, and reap the associated financial gains, including the continued viability of the publication.

99.     The Defendants' defamatory statements were a substantial factor in causing harm to Mr. Prince, including without limitation, monetary loss; harm to Mr. Prince's reputation and good will; resulting loss of profits; interference with and damage to Mr. Prince's relationships with contractual partners, bankers, lenders and the media; loss of market share and business opportunity for his services; loss of recruiting opportunities; loss of investment capital; loss of operating capital; impairment of his ability to raise capital through equity and debt markets; and impairment of his ability to continue to grow his clientele.

100.    Mr. Prince is entitled to injunctive relief restraining the Defendants from committing further defamation per quod.

101.    The Defendants made their defamatory statements with fraud, oppression, actual malice, malicious intent, and with intent to cause the foregoing harm to Mr. Prince and his business. Accordingly, Mr. Prince is entitled to, and should be awarded, punitive damages against each of the Defendants.

102.    Mr. Prince has suffered defamation with special damages in that he has suffered

losses of an economic and pecuniary nature, separate and apart from the libelous nature of the

words used in the Story.

## REQUEST FOR RELIEF

WHEREFORE, Mr. Prince respectfully prays for damages and the entry of judgment, on a

joint and several basis, on his claims against the Defendants as follows:

   a.  An award of compensatory and punitive damages for the tortious and unlawful
       conduct of the Defendants as set forth herein;

   b.  Appropriate injunctive and declaratory relief;

   c.  An award of reasonable attorneys' fees, costs and expenses for this action;

   d.  An award of pre- and post-judgment interest; and

   e.  Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff requests a trial by jury.


RESPECTFULLY SUBMITTED on this 19th day of May, 2020 in Cheyenne, Wyoming.


_____
M. Gregory Weisz, Wyo. Bar No. 6-2934
PENCE & MACMILLAN LLC
1720 Carey Ave., Ste. 600
Cheyenne, Wyoming 82001
Tel.: (307) 638-0386
gweisz@penceandmac.com

Matthew L. Schwartz (*pro hac vice* forthcoming)
Sara K. Winik (*pro hac vice* forthcoming)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Tel: (212) 446-2300
mlschwartz@bsfllp.com
swinik@bsfllp.com