# Exhibit J

 Positive
As of: September 17, 2020 12:21 AM Z

## *Yeager v. Nat'l Pub. Radio*

United States District Court for the District of Kansas

November 9, 2018, Decided; November 9, 2018, Filed

Case No. 18-4019-SAC-GEB

**Reporter**
2018 U.S. Dist. LEXIS 192047 *; 2018 WL 5884596

WILLIAM YEAGER, Plaintiff, vs. NATIONAL PUBLIC RADIO, ANDREW FLANAGAN, JACOB GANZ, and ASHLEY MESSENGER, Defendants.

**Subsequent History:** Affirmed by *Yeager v. Nat'l Pub. Radio, 773 Fed. Appx. 1030, 2019 U.S. App. LEXIS 21663 (10th Cir., July 22, 2019)*

**Prior History:** *Yeager v. Nat'l Pub. Radio, 2018 U.S. Dist. LEXIS 76495 (D. Kan., May 7, 2018)*

## Core Terms

defamatory, film, defamation, album, outrage, hoax, music, interview, quotation, artistic, privacy, slander, fame, nondefamatory, website, malice, movie, scam, invasion, fiction, proven, seller, Beach, vague, bid

**Counsel:** **[*1]** William Conrad Yeager, II, Pro Se Electronic Noticing & Filing, Pro se, Cottonwood Falls, KS.

**Judges:** Sam A. Crow, Senior United States District Judge.

**Opinion by:** Sam A. Crow

## Opinion

**MEMORANDUM AND ORDER**

The court has stated that this case would be dismissed pursuant to defendants' motion to dismiss the original complaint unless plaintiff filed an amended complaint which stated a claim upon which relief may be granted. See Doc. No. 29. Plaintiff has filed a 220-page amended complaint (Doc. No. 36) which the court has construed as a proposed amended complaint and a motion for leave to proceed upon the amended complaint. Defendants oppose the motion. Doc. No. 38. Plaintiff has filed a reply to defendants' opposition. Doc. No. 45.

The proposed amended complaint adds a claim for outrage. Other than that, the proposed amended complaint is similar to plaintiff's original complaint and reads something like a motion for reconsideration. The court has carefully considered the proposed amended complaint and for the reasons stated below finds that it fails to state a claim for relief. The court may refer to the order ruling on defendants' motion to dismiss the original complaint or include portions of that opinion in this order. **[*2]**

I. PROCEDURAL STANDARDS

*Fed.R.Civ.P. 15(a)* provides that leave to amend a complaint shall be given freely when justice so requires. A district court, however, may deny leave to amend where the amendment would be futile. *Jefferson County Sch. District v. Moody's Investor's Servs., Inc., 175 F.3d 848, 859 (10th Cir. 1999)*. If a proposed amended complaint fails to state a claim or is subject to dismissal for another reason, then the motion to amend is futile. See *Fields v. City of Tulsa, 753 F.3d 1000, 1012 (10th Cir. 2014)*. The court incorporates the standards for

2018 U.S. Dist. LEXIS 192047, *2

determining whether a complaint fails to state a claim as set out in Doc. No. 29 at pp. 7-8.

Because plaintiff proceeds pro se, we liberally construe his pleadings, but we will not act as his advocate. *James v. Wadas, 724 F.3d 1312, 1315 (10th Cir. 2013)*. Nor will we excuse him from adhering to the same procedural rules as other litigants. *Garrett v. Selby Connor Maddux & Janer, 425 F.3d 836, 840 (10th Cir. 2005)*.

II. THE PROPOSED AMENDED COMPLAINT

The proposed amended complaint describes plaintiff as follows:

The Plaintiff William (Billy) Yeager is a multi-instrumentalist and songwriter, who has been discovered several times by people such as Chuck Gregory (Columbia Records), Grammy Award Winner Bruce Hornsby, and Bon Jovi and Kiss manager Doc McGhee. Billy Yeager has written and recorded over 2600 musical compositions. In his early 20's he won several National Songwriting contests. In 1983, he produced his first album, What's It **[*3]** Gonna Take. Over 22 of South Florida's top musicians, such as Dennis Noday, Rex White, Jay Drake, Allan Layton and Diane Sherrow, recorded on the album. On his second album Be My Valentine, produced in 1985, Billy played every instrument. The album was recorded at Circle Sound Studios, which is the private recording studio of the Inner Circle Reggae Band. Yeager was the guitar player for the Grammy Award winning band Inner Circle from 1985-1986. "Touter" Harvey and Ian Lewis both were involved in the engineering and production of the Be My Valentine album. Billy has performed and played alongside musicians such as Doug Ingle from Iron Butterfly, Gerry Morotta from Peter Gabriel, Carmine Appice from Vanilla Fudge, Butch Trucks from Allman Brothers, and Pat Travers. In 1987 Yeager recorded with Ira Sullivan, Eddie Higgins, and "Mars" Cowling on Stan Jeff Brown's album Transformation Paradox. Yeager also recorded with Jaco Pastorius who considered Billy one of the greatest guitarists he ever performed with. In the 90s Plaintiff shifted his attention to making films. His first film Jimmy's Story which he filmed for over 23 years, took him several years to edit and was funded by the Cultural **[*4]** Development Group in Miami (Founder, Aaron Morris); the film won 4 awards at the DIFF and Best First Feature at the Palm Beach International Film Festival. Plaintiff has produced, directed and acted in 4 more feature films; A Perfect Song which won him "Best Actor" Award at the Delray Beach Film Festival; The Florida Highwaymen, the story about the famous folk artists who have been featured on PBS and have 12 books published about their story; the film trilogy Jesus of Malibu that took 8 years to complete; and the documentary Sebastian Beach One Fine Day, which Premiered at the NYC Surf Film Festival; there are 2 documentary films produced about the Plaintiff: The Film That Changed The World, which tells the story about Yeager and his wife's desire and mission "to change the world for the betterment of humanity," which won "Most Inspirational Movie Award" at the Red Dirt International Film Festival, and Billy Yeager The Ineffable Enigma which tells the story of the Plaintiff's artistic career and mission, as a musician, filmmaker, activist and humanitarian.

Doc. No. 36, ¶ 70.

Defendant National Public Radio (NPR) published an article about plaintiff on March 23, 2017 and broadcast an **[*5]** interview which concerned plaintiff on March 24, 2017. Defendant Andrew Flanagan wrote the article and he and defendant Jacob Ganz participated in the interview. Defendant Ashley Messenger is an attorney for NPR. The March 23rd article was titled "The Most Expensive Record Never Sold — Discogs, Billy Yeager and the $18,000 Hoax That Almost Was." The article describes how a test pressing of plaintiff's album titled "Billy Yeager 301 Jackson St." was auctioned for $18,000.00 on a resale website — "Discogs" — which is popular with record collectors. This broke the record of $15,000.00 bid for a rare Prince album. Flanagan wrote that this record-breaking sale "seems to have been a fiction woven by the record's creator" and that the website canceled the transaction. In other words, according to the article plaintiff appeared to bid $18,000.00 for his own record. This is what the article referred to as the "hoax that almost was."

On March 24, 2017, Audie Cornish of NPR interviewed defendants Flanagan and Ganz regarding a few pieces of music news. During the interview she questioned them about Flanagan's "reporting" regarding Yeager and the sale of "Billy Yeager ephemera." Doc. No. 13-2, p. **[*6]** 21. Flanagan explained that his report started with an email from Discogs about the record for the most expensive album sold on the site. Flanagan referred to Yeager as "a complete unknown" who sold the album on Discogs to himself to "get this strange type of publicity that he's been seeking his entire life." Id. at

2018 U.S. Dist. LEXIS 192047, *6

p. 22. Ganz stated:

"This guy, as good as he might possibly be, is far more interested in infamy than he is in fame and the chase of pulling the wool over people's eyes. He's a huckster. He's a charlatan. The fact that you can do that on the Internet as well as you can anywhere else is just sort of like part of the long story of people in the music industry doing crazy things I think."

Id.

Plaintiff states in the amended complaint that, before the NPR article and interview, he:

was known as a talented musician and songwriter who had written and recorded songs; as a filmmaker who had produced, directed and acted in award winning independent films; as someone that doesn't compromise his high ideals and values trying to fit in; as someone who had rejected the vanities and the corruption of the mainstream music and film industries; as a seeker of truth; as having relinquished a comfortable **[*7]** life and given away material possessions to set off on a serious spiritual quest with his wife, to try to create artwork that helps to raise conscious awareness in humanity and inspires people to seek truth and become truth; as someone that has been involved with charities since 1985 (World Vision, prison ministry, caregiver, feeding the homeless, church prayer leader); as a bold and courageous artist, one with righteous anger about the injustice in the world, willing to challenge other artists and also raise money to help those who cannot help themselves, etc.

Doc. No. 36, ¶ 88.

Plaintiff alleges that the article and the interview contain many defamatory statements. He alleges that he and his wife communicated several times with Ashley Messenger, seeking without success for defendants to issue a retraction and to have the article and interview removed from NPR's website.

Plaintiff contends that his efforts to raise money with benefit concerts staged at a refurbished missile silo in Kansas were sabotaged by the article and interview. Id. at ¶¶ 341-349. Plaintiff states that the ticket price ($7,500.00) "was to be marketed to the 'well-to-do' upper middle-class people who are very supportive **[*8]** in the arts and are philanthropists interested in helping others." Id. at ¶ 343. The money raised was to be used to buy wheelchairs for land mine victims. He further

contends that he was thrust into a deep depression.

In addition to defamation, plaintiff asserts that defendants are liable for slander, false light invasion of privacy and outrage.

III. DEFAMATION, SLANDER AND FALSE LIGHT STANDARDS

Plaintiff alleges defamation, slander and false light invasion of privacy. Kansas law and federal constitutional law apply here. In Kansas, the tort of defamation includes both libel and slander. *Dominguez v. Davidson, 266 Kan. 926, 974 P.2d 112, 117 (Kan. 1999)*(quoting *Lindemuth v. Goodyear Tire & Rubber Co., 19 Kan. App. 2d 95, 864 P.2d 744, 750 (Kan.App. 1993))*. A valid defamation claim requires proof of: (1) false and defamatory statements; (2) the defendant communicated these statements to a third party; and (3) the plaintiff's reputation was injured by the statements. *El-Ghori v. Grimes, 23 F.Supp.2d 1259, 1269 (D.Kan. 1998)*; see also *In re Rockhill Pain Specialists, P.A., 55 Kan. App. 2d 161, 412 P.3d 1008, 1024 (Kan.App. 2017)*(quoting *Hall v. Kansas Farm Bureau, 274 Kan. 263, 50 P.3d 495 (Kan. 2002))*.

"A statement is defamatory if it diminishes the esteem, respect, goodwill or confidence in which the plaintiff is held or excites adverse, derogatory or unpleasant feelings or opinions against him. A defamatory statement necessarily involves the idea of disgrace." *Clark v. Time Inc., 242 F.Supp.3d 1194, 1217 (D.Kan. 2017)*(interior quotations omitted). A false light privacy action requires that publicity be given to someone **[*9]** which places that person before the public in a false light of a kind highly offensive to a reasonable person.[1] *Hunter v. The Buckle, Inc., 488 F.Supp.2d 1157, 1179 (D.Kan. 2007)*(citing *Rinsley v. Frydman, 221 Kan. 297, 559 P.2d 334, 339 (Kan. 1977))*. The standards and defenses which apply to a defamation claim also apply

---

[1] Some opinions from this court and the Kansas Supreme Court have held that a false light plaintiff must also prove either that a "defendant had knowledge of or . . . acted in reckless disregard for the falsity of the publicized matter and the false light in which the falsehood would place the plaintiff." *Patton v. Entercom Kansas City, L.L.C., 2014 U.S. Dist. LEXIS 77134, 2014 WL 2557908 *8 (D.Kan. 6/6/2014)*; *Tomson v. Stephan, 699 F.Supp. 860, 866 (D.Kan. 1988)*(referring to the elements in *Restatement (Second) of Torts § 652E*); *Stanfield v. Osborne Industries, Inc., 263 Kan. 388, 949 P.2d 602, 610 (Kan. 1997)*(stating the elements set out in *Restatement (Second) of Torts § 652E*).

2018 U.S. Dist. LEXIS 192047, *9

to a "false light" claim. See *Rinsley v. Brandt, 700 F.2d 1304, 1307 (10th Cir. 1983)*(applying same defenses to both causes of action); *Stead v. U.S.D. No. 259, 92 F.Supp.3d 1088, 1109 (D.Kan. 2015)*(the two claims are generally treated the same way); *Castleberry v. Boeing Co., 880 F.Supp. 1435, 1442 (D.Kan. 1995)*(courts treat the two claims similarly); *Restatement (Second) of Torts § 652E* (1977)(*comment e*)(it is arguable that limitations placed on defamation should apply to false light claims).

Subjective statements and statements of opinion are protected by the *First Amendment* as long as they do not present or imply the existence of defamatory facts which are capable of being proven true or false. *Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-19, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990)*; *Pan Am Systems Inc. v. Atlantic Northeast Rails and Ports, Inc., 804 F.3d 59, 65 (1st Cir. 2015)*. This is a question to be determined by the court. *Robinson v. Wichita State University, 2017 U.S. Dist. LEXIS 83577, 2017 WL 2378332 *4 (D.Kan. 5/31/2017)*; *D'Souza-Klamath v. Cloud Cty. Health Ctr., Inc., 2009 U.S. Dist. LEXIS 27881, 2009 WL 902377 *10 (D.Kan. 3/31/2009)*. "[T]he defense available in a defamation action that the allegedly defamatory statements are opinions, not assertions of fact, is also available in a false light privacy action." *Rinsley, 700 F.2d at 1307*; see also, *Robinson, 2017 U.S. Dist. LEXIS 83577, 2017 WL 2378332 at *7*.

Vague language that is subject to multiple interpretations is generally not actionable. See *Montgomery v. Risen, 875 F.3d 709, 713 (D.C. 2017)*(characterization of software sold to the government as a "hoax" is too "loose, figurative or hyperbolic" to be considered defamatory); *Hogan v. Winder, 762 F.3d 1096, 1107(10th Cir. 2014)*("performance issues" & "erratic behavior" — too vague **[*10]** and nonspecific to be defamatory); *Gray v. St. Martin's Press, Inc., 221 F.3d 243, 249 (1st Cir. 2000)*(what is success or failure in the situation of a public communications firm is very much a matter of opinion); *Phantom Touring, Inc. v. Affiliated Publi'ns, 953 F.2d 724, 728 (1st Cir. 1992)*(description of a musical comedy version of "Phantom" as "a rip-off, a fraud, a scandal, a snake-oil job" is too subjective to be proven true or false, even the charge of "blatantly misleading the public" is subjective and imprecise); *Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 129-30 (1st Cir. 1997)*("trashy" is subjective and cannot be verified); *Dilworth v. Dudley, 75 F.3d 307, 310 (7th Cir. 1996)*("scam" may be nondefamatory hyperbole rather than a false assertion of fact depending on

context); *McCabe v. Rattiner, 814 F.2d 839, 842 (1st Cir. 1987)*(the word "scam," used in an article regarding a timeshare sales program, is incapable of being proven true or false); *Nunes v. Rushton, 299 F.Supp.3d 1216, 1231-32 (D.Utah 2018)*("scam" and "hoax" used as opinionated rhetorical hyperbole and therefore, not defamatory); *Robinson v. Wichita State University, 2018 U.S. Dist. LEXIS 22983, 2018 WL 836294 *12 (D.Kan. 2/13/2018)*("too bureaucratic" is subjective and nondefamatory); *Ayyadurai v. Floor64, Inc., 270 F.Supp.3d 343, 361-62 (D.Mass. 2017)*("charlatan" used in a loose figurative manner cannot be defamatory); *Robinson, 2017 U.S. Dist. LEXIS 83577, 2017 WL 2378332 at *4* ("too hierarchal" and "too punishment-centered" are subjective and nondefamatory); D.Kan. 5/31/2017); *Clark, 242 F.Supp.3d at 1219* ("disturbing" management style is subjective and nondefamatory); *McKee v. Cosby, 236 F.Supp.3d 427, 445 (D.Mass.)* aff'd, *874 F.3d 54 (1st Cir. 2017)*("The judgment of an individual's credibility is not an objective fact capable of being proven true or false"); *Paterson v. Little, Brown & Co., 502 F.Supp.2d 1124, 1135 (W.D.Wash. 2007)*("ripoff" is imprecise **[*11]** and incapable of defamatory meaning); *Metcalf v. KFOR-TV, Inc., 828 F.Supp. 1515, 1530 (W.D.Okla. 1992)*(statement that a medical organization was a "sham" perpetrated by "greedy doctors" is a matter of opinion); *NBC Subsidiary (KCNC-TV), Inc. v. Living Will Center, 879 P.2d 6, 11 (Colo. 1994)*(en banc)(statement that a product is a "scam" as a statement of its value is not a defamatory statement).

Defamation cannot arise where the speaker communicates the nondefamatory facts that undergird his opinion. *Piccone vs. Bartels, 785 F.3d 766, 771 (1st Cir. 2015)*; *Ross v. Rothstein, 2014 U.S. Dist. LEXIS 48770, 2014 WL 1385128 *8 (D.Kan. 4/9/2014)*. Even if an expression of opinion may have been skewed by a vindictive motive, if it is "'based on disclosed or assumed nondefamatory facts [then it] is not itself sufficient for an action of defamation, no matter how unjustified or unreasonable the opinion may be or how derogatory it is.'" *Piccone, 785 F.3d at 774* (quoting *Yohe v. Nugent, 321 F.3d 35, 42 (1st Cir. 2003)))*. "[E]ven a provably false statement is not actionable if it is plain the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts." *Riley v. Harr, 292 F.3d 282, 289 (1st Cir. 2002)*(interior quotation omitted). If defendants fully disclosed the facts supporting an opinion and if those facts are not false and defamatory, then neither the opinion nor the statement of facts is defamatory

Olivia Guarna

because it is a pure opinion. *Piccone, 785 F.3d at 771-72*; *Restatement (Second) of Torts § 566* (1977).

If the subject of an alleged defamatory statement **[*12]** is a matter of public concern, then the *First Amendment* requires that the alleged defamatory statement be published with actual malice. *Brokers' Choice of America, Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1109 (10th Cir. 2017)*. "[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego v. Roe, 543 U.S. 77, 83-84, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004)*. Actual malice must also be proven for a public figure to recover damages for defamation. *Mink v. Knox, 613 F.3d 995, 1004 (10th Cir. 2010)*. Public figures can be "general-purpose public figure[s]" — people of "such pervasive fame or notoriety" that they are public figures "for all purposes and in all contexts" — or "limited-purpose public figure[s]" — people who voluntarily enter or are "drawn into a particular public controversy" and thereby become public figures "for a limited range of issues" defined by their "participation in the particular controversy giving rise to the defamation." *Gertz v. Robert Welch, Inc., 418 U.S. 323, 351-52, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)*. This is a question of law. *Ruebke v. Globe Communications Corp., 241 Kan. 595, 738 P.2d 1246, 1251 (Kan. 1987)*.

"Actual malice" is "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)*. "The mere failure to investigate cannot establish reckless disregard for the truth." *Gertz, 418 U.S. at 332*. More is required than "an extreme departure from professional standards" or subjective "ill-will." *Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 665, 109 S. Ct. 2678, 105 L. Ed. 2d 562* & *666 (1989)*. **[*13]** "Rather, there must be 'sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" *Revell v. Hoffman, 309 F.3d 1228, 1233 (10th Cir. 2002)*(quoting *St. Amant v. Thompson, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968))*. This is a subjective inquiry — "'there must be sufficient evidence to permit the conclusion that the defendant had a high degree of awareness of . . . probable falsity.'" *Id.* (quoting *Harte-Hanks Communications, 491 U.S. at 688* (interior quotation marks omitted)). "Reckless disregard 'is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.'" *Id.* (quoting *St. Amant,*

*390 U.S. at 731*). Nor does a failure to correct a statement show actual malice when the statement was published. *Fairbanks v. Roller, 314 F.Supp.3d 85, 93 (D.D.C. 2018)*.

## IV. PLAINTIFF'S CLAIMS IN THE PROPOSED AMENDED COMPLAINT

### A. Claims 1, 2, 5 and 13

These claims concern statements in the NPR article suggesting that plaintiff was the seller and purchaser of his own album on Discogs and that plaintiff did this for fame. Specifically, the statements are:

> Claim 1 - "This is the story of a hoax that almost was. Its motivating force was a hunger for fame or infamy." Doc. No. 36, p. 81.
>
> Claim 2 - "The lightning-fast turnaround on this record-breaking sale, however, seems to have been a fiction woven by the record's creator." **[*14]** Doc. No. 36, p. 99.
>
> Claim 5 - "Now it seems clear that Yeager has attempted to perpetrate another hoax: He is, it seems, the seller who posted 301 Jackson St. on Discogs. He's also likely the buyer. Which means that $18,000 never changed hands and also raises the possibility that the test pressing of 301 Jackson St. does not exist at all." Doc. No. 36, p. 111.
>
> Claim 13 - "Everything about this tale points to Yeager having bought his own unknown record from himself, short of Yeager actually admitting it. But to what end? Likely the one you're reading." Doc. No. 36, p. 127.

The court addressed the statement in Claim 1 at page 17 of the order at Doc. No. 29 where the court stated:

> The statement is an expression of opinion based upon facts disclosed in the article. Moreover, the description of plaintiff's motivation is not verifiable. *Ayyadurai, 270 F.Supp.3d at 365* (a number of courts have recognized that a person's motivations can never been known for sure); *Murray v. Huffington Post.com, Inc., 21 F.Supp.3d 879, 886 (S.D.Ohio 2014)*(suggestion of improper motive is not verifiable because there are no objective tests to determine internal motivation). Plaintiff takes particular offense toward comments suggesting he has sought fame and offers testimony in support of his artistic and humanitarian **[*15]** impulses. The court will not dispute the considerable evidence plaintiff has mustered in support of his character

Olivia Guarna

and abilities. But, this is not an issue for litigation here. The court sides with the view in other defamation cases that statements concerning plaintiff's "motivation or intent are not actionable because they are incapable of being proved true or false." *Ayyadurai, 270 F.Supp.3d at 365*.

See also, Doc. No. 29 at pp. 15-16. Plaintiff does not provide good grounds to alter the court's decision. The same analysis applies to the statements which make up Claim 2 and Claim 13.

As for Claim 5, plaintiff argues that the article's opinions regarding the "hoax" are based upon a false and defamatory fact, i.e., that plaintiff bid upon his own album, "Billy Yeager 301 Jackson St." The court disagrees. The article presents an underlined opinion that plaintiff bid upon his own album. The article states that the sale "seems to have been a fiction woven by the record's creator" and it "seems" that he is the seller of the album and "also likely the buyer." Doc. No. 13-2, pp. 5 & 6. The article supports this opinion by referring to plaintiff's promotional and professional history, the canceling of the transaction by Discogs, articles **[*16]** regarding plaintiff, sales prices for other Billy Yeager "ephemera," and an email dialogue with the supposed seller of the album (using the pseudonym "Al Sharpton") who insisted upon anonymity. As with Claims 1, 2 and 13, Claim 5 is an expression of opinion based upon disclosed facts.

In addition, plaintiff does not allege facts plausibly showing that the opinion that he bid upon his own album is defamatory or that defendants acted with actual malice.[2]

B. Claims 3, 10, 14 and 15

These claims concern statements that plaintiff has hungered for infamy or notoriety and that fail to mention plaintiff's humanitarian or spiritual impulses. Specifically, the statements are:

Claim 3 - "The album, called 301 Jackson St., was record by Billy Yeager, a Florida man who has pursued musical fame (or at least notoriety) for 36 years, by his own account." Doc. No. 36, p. 102.

Claim 10 - "Eventually, Yeager began experimenting with the web and the infinite possibilities it offers, to those with ample time on their hands, for invention, obfuscation and, most

importantly, self-mythology." Doc. No. 36, p. 120.

Claim 14 - "What comes after this, Yeager's latest arguable success (however fleetingly, he held a sales **[*17]** record over Prince — more than most can hope for, at least) might be a form of infamy that he could, for once, be satisfied with." Doc. No. 36, p. 127.

Claim 15 — "The story of Billy Yeager is one of purposeless obfuscation." Doc. No. 36, p. 128.

The court has already addressed statements concerning plaintiff's motivation in the prior subsection of this order. The court also specifically addressed: the statement referred to in Claim 3 at pp. 17-18 of the court's prior order; the statement referred to in Claim 15 at pp. 24-25 of the court's prior order; and the statement referred to in Claim 10 at pp. 25-26 of the court's prior order. Plaintiff has failed to persuade the court that these holdings are incorrect. The court believes the holdings apply as well to the statement set out in Claim 14.

C. Claims 4, 6 and 7

These claims concern statements regarding plaintiff's "Jimmy's Story" movie which plaintiff has described as absurdist performance art criticizing or satirizing the media's obsession with celebrity. For the movie, plaintiff dyed his skin brown and portrayed himself as "Jimmy Story" the love-child of Jimi Hendrix. The statements are:

Claim 4 - "The most eccentric — and ill-conceived **[*18]** — example of his promotional facility, bar none, came when Yeager spent two years planning and executing a hoax that would eventually convince a television station and a weekly paper to believe that he was Jimmy Story, the son of Jimi Hendrix, who was in possession of lost recordings from the psychedelic legend. To pull off the scam, Yeager dyed his skin brown." Doc. No. 36, p. 107

Claim 6 - "Could this story get any weirder? As the [Miami] Herald notes, the Jimmy Story hoax (you can see a picture of Yeager as Jimmy Story, with dyed brown-face, on his website—note that many-to-most of the clippings included in that image, such as a cover story from The New York Times, are clearly fake) began, as few things do, with Bruce Hornsby. (Yes, that Bruce Hornsby.) In 1990, the story goes, Hornsby heard a demo tape of Yeager's, liked what he heard and connected Yeager with Capitol Records, who gave Yeager a shot. It was the closest he would come to fame, but

---

[2] As explained in the court's prior order, plaintiff should be considered a limited public figure as to the controversy concerning the Discogs sale. Doc. No. 29, p. 15.

Olivia Guarna

it cemented in Yeager's mind what he'd thought for some time: that he was destined for, perhaps owed, greatness. The catalyst Hornsby provided would become a source of obsession. As the Herald wrote, years after Hornsby's co-sign, Yeager **[*19]** was far from success, surviving "on odd jobs," living "in a cramped beach apartment with surfboards on the walls" with "a drawer jammed with hundreds of terse rejection letters from recording companies." Embittered, Yeager began to plan the Jimmy Story bamboozle. After two years of preparation, Jimmy Story became a cover star." Doc. No. 36, pp. 112-13.

Claim 7 - "Less than two years after that, Yeager had assembled, roughshod and chaotic, a documentary about his life, with the Jimmy Story hoax as its centrifugal force." Doc. No. 36, p. 114.

The court addressed many of the statements in Claims 4 and 6 at pp. 19-22 of the court's prior order. Plaintiff does not persuade the court that the prior order was incorrect. The court also believes plaintiff is a limited public figure as regards the movie "Jimmy's Story" as well as the Discogs sale. Cf., *Dilworth v. Dudley, 75 F.3d 307, 309 (7th Cir. 1996)*(obscure engineer who published an obscure article in an obscure academic publication is a "public figure" as to that article). Plaintiff does not plausibly allege facts showing that the statements regarding "Jimmy's Story" were made with actual malice.

Plaintiff contends that, contrary to the NPR article, neither the television station nor the weekly **[*20]** paper were "convinced" that plaintiff was the son of Jimi Hendrix. Doc. No. 36, p. 107. He does not plausibly show, however, that the statement in Claim 4 was defamatory or that the use of such vague terms as hoax, bamboozle and scam in the context of the article should be considered defamatory.[3] Plaintiff also states that "Jimmy's Story" encompasses several film genres,

some of which suggest deception.[4] And, plaintiff comments that a reviewer stated it was difficult to distinguish what is real and what is fantasy in the movie. Doc. No. 36, p. 114. This further supports the court's conclusion that the statements in Claims 4, 6 and 7 are matters of opinion and not defamatory.

Plaintiff states that he and his 25 years of work creating the film "Jimmy's Story" have been defamed by defendants; that he was presented in a false light as a foolish character and that his movie was presented not as art and an award-winning film, but as a chaotic product of an embittered man. Doc. No. 36, p. 115. Whether or not defendants missed the point of the film and missed plaintiff's artistic intentions, is a matter of opinion and not something to be litigated in a defamation action.

Plaintiff **[*21]** states that there were never hundreds of terse rejection letters as the NPR article quoted the Miami Herald as saying. He does not assert, however, that the quotation was fabricated. Nor does he allege facts which would plausibly show that the quotation evokes disgrace or that defendants employed the quotation with knowing or reckless disregard for its truth or falsity.

Finally, plaintiff objects to the term "embittered."[5] This term as used by defendants is vague and relates to an unverifiable emotion or motivation. It is a matter of opinion. Therefore, it is not defamatory.

D. Claims 8, 11, 12, 16, and 17

These claims involve statements in the NPR article that concern the relative success of plaintiff's music and film career and the availability of his music and videos. Specifically, the claims concern the following statements:

Claim 8 - "A tumble down the rabbit hole of Yeager's life is quixotic indeed — relentless failures

---

[3] Indeed, plaintiff states in the proposed amended complaint that "Jimmy's Story" involves a fictional hoax, as opposed to a real hoax: "The fictional character 'Jimmy Story' carries out a hoax in the film *Jimmy's Story;* the hoax is fictional; the hoax was never intended to be, and it never was a real hoax carried by Billy Yeager in reality . . . Billy Yeager and Glenn DeRosa informed the press when Jimmy Story was put on the cover of XS Magazine in 1996 . . . that it was just a performance artwork for the film[]. Billy was simply using his film and his character to deliver an important message about the possible effects of the culture we are creating." Doc. No. 36, p. 89.

[4] "[D]ocumentary film, mockumentary, pseudo-docu, docu-fiction, and cinema verite." Doc. No. 36, p. 86.

[5] Plaintiff distinguishes bitterness from his "righteous anger" with the "stupid news the media feed our society when they could be informing the people about so many important issues and individuals doing great work in this world." Doc. No. 36, p. 108. He also states in the complaint, as previously set forth in this order, that he has "rejected the vanities and the corruption of the mainstream music and film industries" and that he has a "righteous anger about the injustice in the world." Id. at p. 59. The distinction between bitterness and righteous anger is not a proper issue for litigation.

and his ceaseless drive to reverse them form a closed loop that only occasionally reaches out into the real world. Diving in, you realize quickly you are not in control here, like Alice chasing the rabbit. Like a dog chasing a car." Doc. No. 36, p. 117.

Claim 11 - "For [*22] all his purported virtuosity and the ostensible existence of multiple recordings, his music is — besides grainy footage of Yeager shredding, tank-topped and beachbrowned, in a backyard jam session — practically inaccessible in an age of ubiquitous access." Doc. No. 36, p. 121.

Claim 12 - "Instead, Yeager created a murkier — possibly entirely fictional — network of identities with the purpose of propping himself up, like stilts under a sun-worn beach house. This network appears to be composed of publicists, managers, film producers and retailers of Yeager memorabilia — or what normal folks call items of sentimental value." Doc. No. 36, pp. 122-23.

Claim 16 - "Yeager, for all the belief he has in his promise and his failures expressing it, has repeatedly poured more of his creative energy into being a trickster-booster than he has an artist." Doc. No. 36, p. 129.

Claim 17 - "If that art does indeed exist, we'll probably never hear it at a price we're willing to pay." Doc. No. 36, p. 131.

The court discussed the statement in Claim 8 at p. 23 of the court's prior order and the statement in Claim 11 at pp. 24-25 of the court's prior order. The court discussed the statements made in Claims 16 [*23] and 17 at pp. 25-26 of the court's prior order. The court shall not alter or modify those holdings.

Claim 12 involves a qualified opinion that plaintiff created a murky, - "possibly entirely fictional" - network of identities acting as publicists, managers, film producers and retailers of Yeager memorabilia. The statement is supported by a quotation from John F. Stacey, who wrote a newspaper piece about plaintiff in 1997 and said he stayed in touch with plaintiff for years after, but lost touch about ten years prior to the NPR article. Stacey told defendants that Chris Von Weinberg, listed on plaintiff's website as a press contact, was actually plaintiff, and that plaintiff had created "all these fake identities" as he has "migrated onto the Internet." Plaintiff does not dispute that Stacey said this, but claims the statement is false.[6] The article also refers to

"South Florida Collectibles" and "southflamusic" (whose spokesperson identified himself as "Al Sharpton") as sellers of Yeager-connected items.

The statement in Claim 12 is an opinion based upon disclosed facts. The opinion is qualified in such a manner as to be vague and not to insinuate a false defamatory fact. Nor does the [*24] implication that plaintiff has used pseudonyms to sell or promote items from his career evoke disgrace so as to be defamatory. For these reasons, the court finds that Claim 12 fails to state a claim.

E. Claim 9

In Claim 9, plaintiff asserts that the article falsely portrays the reason why plaintiff's wife traveled from Spain to Florida and eventually married plaintiff. The court addressed this claim on page 24 of the court's prior order. The court shall continue to hold that the statement is not defamatory.

F. Slander claims

Plaintiff's slander claims are listed at p. 133 of the proposed amended complaint. The claims are based upon the following statements: 1) that plaintiff is a "complete unknown" who sold an album to himself on Discogs to "get this strange type of publicity that he's been seeking his entire life"; 2) that plaintiff is a "huckster" and a "charlatan" and "part of the long story of people in the music industry doing crazy things I think"; and 3) that "it seemed that this sale was from him to him and — get this strange type of publicity that he's been seeking his entire life."[7]

The court finds that these statements do not support a claim for defamation or slander or false [*25] light for the reasons stated in the court's previous opinion at pp. 15-16 and in this opinion at pp. 13-20.

G. False light invasion of privacy

For the reasons stated previously in section IV of this order, the court finds that plaintiff has not stated a false light claim.

H. Defamation and false light invasion of privacy claims against defendant Messenger

As explained at pp. 27-28 of the court's prior order,

---

[6] Plaintiff has attached an exhibit to the proposed amended complaint with evidence that Chris Von Weinberg is a real

person who served as a personal manager for plaintiff and did not respond to defendant Flanagan's request for an interview. Doc. No. 36, p. 25.

[7] See transcript of interview at Doc. No. 13-2, p. 22.

Olivia Guarna

2018 U.S. Dist. LEXIS 192047, *25

defendant Messenger may not be sued for defamation or false light invasion of privacy on the grounds that she refused to remove the alleged defamatory material from the NPR website or other platforms and refused to retract the statements to which plaintiff objects.

I. Outrage

Conduct sufficient to establish the tort of outrage must be extreme and outrageous - - that is, "so severe that no reasonable person should be expected to endure it" and "so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Roberts v. Saylor, 230 Kan. 289, 637 P.2d 1175, 1179 (Kan. 1981)*; see also *Lee v. Reed, 221 F.Supp.3d 1263, 1274 (D.Kan. 2016)*.  Plaintiff contends that defendants' publication and broadcast of the article and interview, as well as defendants' refusal to grant plaintiff the relief he requested **[*26]**  when he complained to NPR, is conduct so outrageous in character and so beyond the bounds of decency that it can support a claim of outrage. The court disagrees with plaintiff's contention and finds support in the following cases. *Carraway v. Cracker Barrel Old Country Store, Inc., 2003 U.S. Dist. LEXIS 12326, 2003 WL 21685909 *14 (D.Kan. 7/16/2003)*(spreading false rumors that plaintiff stole money, used drugs, had a drinking and/or gambling problem and was lesbian is not outrageous); *Bolduc v. Bailey, 586 F.Supp. 896, 902-03 (D.Colo. 1984)*(following Kansas law, dismissing outrage claim where defendant accused a priest of theft, lying, treason resulting in the death of "patriots" and immoral conduct); *Hanrahan v. Horn, 232 Kan. 531, 657 P.2d 561 (Kan. 1983)*(telling class a false rumor that plaintiff was held as a suspect in son's murder is not outrageous conduct); see also, *Cook v. Winfrey, 141 F.3d 322, 331-32 (7th Cir. 1998)*(celebrity's statement that plaintiff is a liar does not constitute outrage under Illinois law); *Black v. Wrigley, 2017 U.S. Dist. LEXIS 202260, 2017 WL 8186996 * 12 (N.D.Ill. 12/8/2017)*(applying Illinois law, making false statements to party's employer to hurt plaintiff's reputation and prevent her from testifying is unseemly but not so extreme as to be utterly intolerable in a civilized community).

V. CONCLUSION

For the above-stated reasons, the court finds that plaintiff's motion to amend (Doc. No. 36) should be denied as futile because the proposed amended complaint fails to state a claim.[8] The court therefore grants defendants' **[*27]**  motion to dismiss (Doc. No. 13) and directs that this case be closed.

**IT IS SO ORDERED**.

Dated this 9th day of November, 2018, at Topeka, Kansas.

/s/ Sam A. Crow

Sam A. Crow, U.S. District Senior Judge

---

**End of Document**

---

[8] Plaintiff's proposed amended complaint also violates the "short and plain statement" requirement in *Fed.R.Civ.P. 8(a)*. If the court determined that plaintiff's proposed amended complaint stated a claim for relief, then the court would command that plaintiff submit another proposed amended complaint which could be considered a short and plain statement.